**J. Ralph SAYLOR, Plaintiff-Appellant,**

**v.**

**Thayer LINDSLEY et al., Defendants-Appellees,**

**and**

**Roseanne Horn, Michael J. McLaughlin, Objectors-Appellants,**

**and**

**Abraham I. Markowitz, Appellee.**

**Nos. 474, 475, Dockets 71–1332, 71–1380.**

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1972.

Decided March 7, 1972.

Lillian Eichman, New York City, for appellant Saylor.

Avrom S. Fischer, Brooklyn, N. Y., for appellant Horn.

Reeves & O'Brien, New York City, for appellant McLaughlin.

Herbert Jacobi, New York City (Wickes, Riddell, Bloomer, Jacobi & McGuire, New York City, of counsel), for appellees Lindsley, Stott, Zeckhausen, Northfield Mines, Inc. and Mines Inc.

Abraham I. Markowitz, pro se.

Before FRIENDLY, Chief Judge, and ANDERSON and MANSFIELD, Circuit Judges.

FRIENDLY, Chief Judge:

This appeal raises questions about the settlement of a stockholder's derivative action over the objection of the plaintiff. While we decline to lay down a rule that this may never be done, we hold that the procedures here followed did not adequately protect the right of plaintiff, and of other objecting stockholders, to develop a record which might show that the settlement was improvident.

The transaction here at issue, the two-step sale to Mines Incorporated, in 1951 and 1953, by the Tonopah Mining Company of Nevada (Tonopah) of the stock of Tonopah Nicaragua Company (Tonopah Nicaragua), owner of the Rosita copper mine, is no stranger to the courts of this circuit. The history of an earlier action attacking the sale, Hawkins v. Lindsley, brought in 1957, in the District Court for the Southern District of New York, is recounted in Judge Swan's opinion for this court, 327 F.2d 356 (2 Cir. 1964). It suffices here to say that a second amended complaint in that action charged that the sale violated both state law of fiduciary obligations and the Investment Company Act of 1940; that in September, 1958, Judge Noonan dismissed the claim under the Investment Company Act and required the furnishing of $50,000 of security pursuant to § 61-b of the New York General Corporation Law (McKinney's Consol.Laws, c. 23 Supp. 1971–72); and that when plaintiff failed to post security, Judge Ryan, on July 27, 1961, ordered dismissal with prejudice. Plaintiff failed to take a timely appeal, and other efforts to vacate Judge Ryan's order of dismissal were rejected in the opinion cited.

In February, 1965, plaintiff Saylor began this action, also in the District Court for the Southern District of New York. Federal jurisdiction was based on violations of the federal securities laws, and state claims were alleged merely as pendent. Defendants responded by way of a motion for summary judgment on the basis that this new action was barred by *res judicata* and by the applicable statute of limitations. Judge Cooper granted the motion and dismissed the complaint on the ground of *res judicata*; in addition, while not purporting to decide the defense of limitations, he suggested that this presented a question which, if plaintiff appropriately amended his complaint, would create a triable issue of fact, 274 F.Supp. 253 (S.D.N.Y.1967). We reversed on the ground that the dismissal of the *Hawkins* action for failure to post security was not "on the merits" for purposes of *res judicata*; we indicated agreement with Judge Cooper's statement as to the defense of limitations and remanded for further proceedings with respect to that issue. 391 F.2d 965 (2 Cir. 1968).[1] In an opinion on remand, Judge

---

1. The opinion does not discuss in terms the effect of Judge Noonan's dismissal of the claim under the Investment Company Act in *Hawkins* in 1958. Apparently the

Cooper determined that with respect to the federal claims there were, indeed factual questions whether the applicable statute of limitations had run, and therefore denied summary judgment on that ground; however, with regard to the pendent state claims, he granted summary judgment on the basis of the running of the applicable limitations period unless within thirty days of the court's order plaintiff amended his complaint in certain material respects, 302 F.Supp. 1174 (S.D.N.Y.1969).[2] The defendants filed their answer on January 9, 1970, denying most of the allegations in the complaint and setting up a number of affirmative defenses.

■ On September 24, 1970, Mr. Markowitz, "attorney for plaintiff," entered into a stipulation of settlement with the attorneys for the various individual and corporate defendants and the attorneys for Tonopah, which had previously been dissolved. This provided for the payment to Wilmington Trust Company, which a Delaware court had appointed to receive and distribute any assets of Tonopah that could not be distributed in liquidation before March 31, 1965, of $250,000 less the costs of notice of the settlement hearing and the fees and disbursements of plaintiff's counsel. Although there is a dispute when agreement on the settlement was actually reached, it is not asserted that plaintiff Saylor at any time authorized it or that Markowitz or anyone else advised him of its terms until November 4, 1970.

On that date Judge Ryan had signed an order setting a hearing on the settlement for December 1, 1970. The notice approved for transmission to stockholders contained no intelligible reference to the

most important allegation of the complaint, namely, that defendants had intended the sales to Mines Incorporated to constitute only a step in an ultimate transfer to defendant La Luz Mines, Limited.[3] The notice informed stockholders that transcripts of depositions could be read at the office of the clerk of the district court, and that exhibits could be inspected at the offices of the attorneys. The notice indicated that Mr. Markowitz would apply for an allowance of $83,000 and expenses of $1,313.73. After deduction of these sums, which were subsequently allowed, distribution to Tonopah stockholders would be something less than $166,000, or about 19 cents a share, as against the many millions of dollars in damages alleged to have been suffered. Of this amount, over $109,000 would be paid to the unserved defendant, Falconbridge Nickel Mines, Limited, which held some 74% of Tonopah's shares at the time of the latter's dissolution; the balance, some $57,000, would go to the independent stockholders.

At the hearing on December 1, 1970, Mr. Markowitz announced that he appeared "on behalf of the plaintiff." This elicited a response by Lillian Eichman, who had been of counsel in the *Hawkins* action, that she appeared on behalf of Mr. Saylor in opposition to the settlement. Avrom S. Fischer announced he represented another opposing stockholder, Roseanne Horn, and was of counsel to Mrs. Eichman. Gerard J. O'Brien appeared on behalf of another objecting stockholder, Michael J. McLaughlin. McLaughlin, Saylor, and Fischer, on Miss Horn's behalf, filed affidavits in opposition. Mr. Markowitz made an extended statement in support of the settlement,

court proceeded on the ground that there could have been no true "dismissal" of what was merely an alternative theory of recovery for the same operative facts, see 391 F.2d at 969, n. 6, and that the only final judgment in the *Hawkins* case was that entered by Judge Ryan in 1961 for failure to post security. Judge Noonan's order was not appealable, see 327 F.2d at 358 n. 2, and for that reason also would not have *res judicata* effect. Cf.

ALI, Restatement of Judgments § 69 (1942).

2. The record contains no indication of any amendment to the complaint being filed within the time stipulated or at any time thereafter.

3. We intend no criticism of the district judge on this score; the form of the notice was prepared by counsel.

which was seconded by Mr. Jacobi, counsel for the defendants, and Mr. Singer, counsel for Tonopah, who reported approval of the settlement by Wilmington Trust Company. After briefly hearing Mr. Fischer and Mr. O'Brien, the judge gave them two weeks in which to submit further papers. McLaughlin and Fischer filed extensive affidavits; Markowitz submitted a reply affidavit. On January 14, 1971, the court issued an opinion approving the settlement, [1970–71 Transfer Binder] CCH Fed.Sec.L.Rep. ¶92,222, at 90,410 (S.D.N.Y.1971); this was followed by the order here under appeal.

As earlier stated, there is a dispute about the time when the settlement was actually reached. McLaughlin's second affidavit stated that Markowitz informed him on June 4, 1969, of a meeting to be held the next day to discuss settlement; that "on Aug. 20, 1969, [Markowitz] informed me of the present offer, which I refused. Mr. Saylor soon thereafter advised me that he had similarly told Mr. Markowitz that he does not agree to any settlement, such as the present proposal." Fischer's second affidavit pointed to a letter to Miss Horn, dated October 29, 1969, from a member of the firm representing defendants, which states in part:

> Without going into details as to all the procedural matters that have taken place in the meantime, I can tell you that we have been in active negotiations with counsel for the plaintiff and today agreed on a settlement of the case. It will be necessary to have examinations of several people because the entire settlement will be subject to approval of the court and the court will

have to be convinced that it is in the best interest of the stockholders.

Fischer also relied on the nature of the three depositions taken by Markowitz and filed with the District Court, which, we must say, impress us as designed to justify a settlement rather than as an aggressive effort to ferret out facts helpful to prosecution of the suit, as evidence that a settlement had been agreed upon by the time they were taken. In contrast, Markowitz asserted in his reply affidavit that on August 20, 1969, he did not inform McLaughlin of defendants' offer but essentially of the prospects of negotiations; that on September 27, 1969, he called Saylor to advise him of the negotiations and the weakness of plaintiff's case; that he and counsel for Lindsley did believe on October 28, 1969, they had agreed on a settlement, but this subsequently fell through because there was in fact no agreement on the extent to which Falconbridge as a stockholder of Tonopah should share in the proceeds; that subsequent negotiations foundered; and that on January 15, 1970, he sent McLaughlin a letter which he claims informed McLaughlin that settlement negotiations were halted.[4] We find it unnecessary to resolve this dispute or to direct the district court to do so, for even on the basis of Markowitz' version of the relevant events we cannot conclude that enough was done here to protect the rights of the stockholder plaintiff.

■■ We are willing to go along with appellees and hold, despite the seeming incongruity, that the assent of the plaintiff (or plaintiffs) who brought a derivative stockholder's action is not essential to a settlement;[5] a contrary view

---

4. The pertinent part of the letter read:
   I have concluded all discussions of settlement and am proceeding with pre-trial proceedings. In that connection, the defendants are supplying me with documents that I have requested and depositions of defendants and others are being scheduled.
   Everything turns on the meaning of "concluded." Plaintiff says it means "finished." Markowitz, relying on the reference to "pre-trial proceedings", contends

it means "broken off". Plaintiff counters that the October 29 letter of defendants' counsel quoted in the text contemplated the taking of depositions prior to a hearing on a settlement.

5. See 3B Moore, Federal Practice ¶ 23.1.24 [2], at 23.1–407 (1969); 2 Barron & Holtzoff, Federal Practice and Procedure § 570, at 335. (Wright ed. 1961). Denicke v. Anglo California Nat'l Bank, 141 F.2d 285 (9 Cir.), cert. denied, 323 U.S.

would put too much power in a wishful thinker or a spite monger to thwart a result that is in the best interests of the corporation and its stockholders. On the other hand, despite the fact that the usual plaintiff in a derivative stockholder's action does not give his attorney the help normally furnished by a client, we are not willing to go to the other extreme and accept the view that the attorney for the plaintiff is the *dominus litis* and the plaintiff only a key to the courthouse door dispensable once entry has been effected. The attorney remains bound to keep his client fully informed of settlement negotiations, to advise the client before signing a stipulation of settlement on his behalf, and, if the client has objected, to inform the court of this when presenting the settlement, so that it may devise procedures whereby the plaintiff, with a new attorney, may himself conduct further inquiry if so advised.[6] We find the record before us inadequate to sustain the conclusion that this obligation was met here—whatever the timing of the initial agreement in principle on the settlement. As has been said in an article much relied upon by appellee Markowitz, "As a practical matter, derivative settlements concluded over the head of the complaining stockholders are

extremely rare and should be so." Haudek, The Settlement and Dismissal of Stockholders' Actions—Part II: The Settlement, 23 Sw.L.J. 765, 771 (1969).

■ There can be no blinking at the fact that the interests of the plaintiff in a stockholder's derivative suit and of his attorney are by no means congruent. While, in a general sense, both are interested in maximizing the recovery this is only a half-truth. Even apart from special considerations which, as has been noted, may cause special divergence of interest in cases where extremely large amounts are at stake, see Haudek, *supra*, 23 Sw.L.J. at 768 & n. 166, there is a difference in every case. The plaintiff's financial interest is in his share of the total recovery less what may be awarded to counsel, *simpliciter*; counsel's financial interest is in the amount of the award to him less the time and effort needed to produce it. A relatively small settlement may well produce an allowance bearing a higher ratio to the cost of the work than a much larger recovery obtained only after extensive discovery, a long trial and an appeal. The risks in proceeding to trial vary even more essentially. For the plaintiff, a defendant's judgment may mean simply the defeat of an expectation, often of relatively small

739, 65 S.Ct. 44, 89 L.Ed. 592 (1944), the case usually cited for this proposition, supports it only to a limited extent. There the corporation, the real party in interest, had come under new management, which made a settlement with the defendants and secured court approval of it over the objection of the stockholder plaintiff. Settlement of a derivative action by the real party in interest over the plaintiff's objection is quite different from settlement by the plaintiff's own attorney over the plaintiff's objection. Moreover, it appears that in *Denicke* the corporation attempted to keep the stockholder plaintiff informed of the settlement negotiations. 141 F.2d at 286. Although in this case the Wilmington Trust Company could arguably be cast in the role of the settling real party in interest, we are not inclined to do that here since the statements made at the hearing and the affidavit submitted by its attorney in support of the settlement do not convey the impression that it either actively participated in the ne-

gotiations or reviewed the settlement in depth.

6. In this connection we find it rather significant that although the stipulation of settlement was signed on September 24, 1970, Mr. Markowitz did not formally advise his client of the settlement until November 4, after Judge Ryan had signed the order directing a hearing and approving the form of notice. It was thus largely his own fault that, as claimed in his affidavit of December 17, 1970, "[he] had no knowledge of Mr. Saylor's objection to the settlement until the Hearing before the Court." What is more important, prompt advice of the signature of the stipulation to Mr. Saylor would have allowed the latter to communicate his opposition to Mr. Markowitz and the Court before the notice of the hearing was approved; if he had done so, the notice should have stated this and a greater amount of opposition might have developed.

amount; for his lawyer it can mean the loss of years of costly effort by himself and his staff. In this respect a derivative action is in a quite different posture from a personal injury action conducted on a contingent basis. We say this not in criticism but in simple recognition of the facts of class action life. While recognition of this conflict of interest should not mandate rejection of a settlement opposed by the plaintiff but represented by the attorney to be in the best interest of all stockholders, it does require the court to exercise particular care to see to it that the non-assenting plaintiff has had a full opportunity to develop the basis for his objection.

In many suits which have been prepared almost to the point of trial, the pretrial discovery, conducted when the objective of plaintiff's attorney was still to develop the strongest possible basis for a recovery, may be entirely adequate to that end. But that is not the case here. Two of the defendants, La Luz and Falconbridge,[7] had not even been served. The only depositions taken were those of defendants Zeckhausen and McWilliams and of H. S. McGowan, president of La Luz. Naturally these gentlemen were not disposed to assist plaintiff in sustaining his theories of recovery; helpful testimony from them could be obtained only by confronting them with documents they would find difficult to explain. Yet there had been little discovery of documentary evidence save of such generally self-serving instruments as minutes and annual reports, although even these proved valuable to plaintiff as we shall see; there had been no attempt to find the kind of inculpatory correspondence that so often reposes in corporate files even for the long time here involved, and refutes, or at least casts doubt upon, exculpatory testimony by the defendants of the sort here given.[8]

Despite all this, we ought not to take up the time of the district court and the parties with a remand if, on the basis of undisputed facts, a substantial recovery here was hopeless or nearly so. We do not think, however, this can fairly be said on the record before us. We shall limit our discussion to what we consider plaintiff's most promising theory—that the defendants, or at least some of them, in obtaining the SEC exemptions from § 17(a) of the Investment Company Act of 1940 which were required for the sale of the stock of Tonopah Nicaragua to Mines Incorporated, had concealed that the true beneficiary of the transfers was always intended to be La Luz,[9] which was in a peculiarly advantageous position to develop the mine economically, and thus the consideration was unfairly low.

In order to understand the problem, some knowledge of the intricate intercorporate relations is needed. Plaintiff's complaint alleges the following facts in this respect: In 1950 Ventures, Limited, owned 13.48% of the voting stock of Tonopah, a registered investment company; by 1953 the proportion had increased to 26.25%, presumptively control under § 2(a) (9) of the 1940 Act. Defendant Lindsley, individually and through defendant Northfield Mines, Inc., owned more than 34% of the voting stock of Ventures. That company owned in excess of 54% of the voting stock of Frobisher Ltd., of which Mines Incorporated was a wholly owned subsidiary. Also Ventures owned more than 69% of the voting stock of La Luz, which owned and operated a gold and silver mine in Nicaragua only thirty miles away from Tonopah Nicaragua's Rosita copper mine and had developed a hydro-electric power plant at a site which was apparently the

---

7. Ventures, Limited, which is nominally a defendant, also was not served. However, it was merged into defendant Falconbridge in 1962, before this action was instituted.

8. The annals of antitrust litigation and, indeed, of stockholder's derivative actions include many such instances, including the "destroy all copies" sort.

9. La Luz, like Mines Incorporated, was an "affiliated person" of Tonopah within § 2(a) (3) of the Investment Company Act, see *infra*.

only feasible one in the area and was even closer to the Rosita mine than to its own.

In November, 1950, Tonopah applied, pursuant to § 17(b) of the 1940 Act, for an exemption permitting the sale of 60% of the stock of Tonopah Nicaragua to Mines for $210,000. This was necessary because Ventures' ownership, then 13.-48%, of the voting stock of Tonopah and of some 54% of the voting stock of Frobisher made Tonopah and Mines affiliated persons within § 2(a) (3). The application recited unsuccessful efforts in 1948–49 to sell the Rosita mine at a net price of $297,000, and a similarly unsuccessful effort early in 1950 to sell it for $275,000. There appears never to have been doubt that the Rosita mine possessed very substantial copper reserves; the problem was the cost of mining and refining, due to the mine's remote jungle location and the complex nature of the Rosita copper ore. The application was twice amended, apparently on the insistence of the SEC, to incorporate further detail, including a report by an engineering firm, Singmaster & Breyer, bringing up to date a 1943 report by A. Wheeler, which showed that the cost of producing a pound of refined copper by a process involving the use of a flotation concentrator, a reverberatory furnace, and converters would be 31.6 cents as against a domestic copper price, as of February 21, 1951, of 24.5 cents, and would require investment of $12,000,000, several times Tonopah's total resources. On April 16, 1951, the SEC granted the exemption.

In January, 1953, Tonopah filed an application with the SEC for a § 17(b) exemption for the sale of the remaining 40% of the stock of Tonopah Nicaragua to Mines for $65,000 plus 10,000 shares of common stock of Falconbridge Nickel Mines Limited having a market value of some $200,000, more or less, in Canadian funds. Defendant Lindsley was president of Falconbridge, and Ventures owned 61.1% of its stock. Just how Mines came into ownership of the 10,000 shares was not explained. This application, too, was twice amended. One amendment included a new report from Singmaster &

Breyer showing that "the most feasible process," still the flotation concentrator, reverberatory furnace and converters recommended by Wheeler a decade before, would now require a capital investment in excess of $13,500,000 and would result in a cost per pound well above current copper prices. The SEC granted the exemption in November, 1953.

All of the Tonopah Nicaragua stock was transferred from Mines to its parent, Frobisher, on February 11, 1954. Frobisher then entered into agreement, dated September 21, 1954, to sell the Tonopah Nicaragua stock—and thus the Rosita mine—to La Luz for $515,907.65. Evidently an agreement in principle had been made much earlier, since the minutes of a La Luz shareholders' meeting on May 26, 1954, recited that half the price had already been paid. The mine was conveyed in January, 1955. The refining method evaluated by Wheeler and by Singmaster and Breyer being economically impracticable, La Luz apparently devoted considerable effort to the development of an electrolytic refining process for the Rosita ore. That process, however, was also eventually rejected because of excessive capital requirements and too narrow a profit margin. Ultimately, it was decided not to smelt and refine the ore at the mine site, but rather to use a leach precipitation flotation process to produce a copper concentrate which was then shipped overseas for smelting and refining. The operating cost of producing a pound of refined copper by this process was estimated to be 22 cents by H. S. McGowan in 1957, and the capital cost to La Luz was in fact only some $7,-500,000. Acquisition of the mine was hugely profitable to La Luz; objector McLaughlin asserts that La Luz realized net operating profits from it of $38,660,-000 between 1959 and 1969.

Although the 1950–51 exemption application to the SEC contained no reference to La Luz, that company's report to stockholders for the fiscal year ended September 30, 1951, issued on March 12, 1952, stated, in explanation of a small balance sheet item entitled "Rosita property

. . . $26,763.62," that this "represents expenditures made by La Luz investigating a high-grade copper property within thirty miles of your gold mine in Nicaragua. Your Board considers this property as having great promise and has joined with Mines Inc. and Northfield to purchase a 60% interest in the Tonopah Nicaragua company, who are the owners." The second application, of January, 1953, made no reference to any such joinder by La Luz in the ownership of Tonopa Nicaragua, although the first amendment, dated July 7, 1953, said that if the sale were effected and the Rosita property profitably operated, "Tonopah would share in the profits as it is presently contemplated that a Management Contract would be made with La Luz Mines Ltd.," in which Tonopah had an 8% stock interest, "for the operation of the Rosita property." La Luz' annual report for the year ended September 30, 1954, told of the contract for the acquisition of the Rosita mine mentioned above and added:

> We consider the possibility of a successful operation on the Rosita property as very encouraging. Calculations based on ore now blocked out indicate 3,582,000 tons of ore averaging 2.91% copper and .027 ozs. of gold per ton. At an estimated price of 30¢ per pound the gross value of copper content (208 million pounds) works out at over $62,-000,000.

> Research work, carried on for several years, indicates that electrolytic cathode copper can be produced at a cost not exceeding 15¢ per pound at the plant. This cathode copper is readily marketable at a trifle less than the wire bar price—a considerable amount of the gold will be recovered as a by-product.

> Electric power is an important factor in the proposed process and the possibilities of expanding the La Luz hydroelectric system to produce the additional power for Rosita is being investigated. Results obtained so far indicate that the power plant expansion is feasible and at not too great a cost.

None of this history explicitly refutes defendants' claim that, at the time the SEC granted the first exemption application in April, 1951, there was no thought that La Luz, also an "affiliated person" of Tonopah within § 2(a) (3), would become the owner of the Rosita mine, although La Luz' statement of joint ownership in its 1951 annual report at least creates some basis for scepticism. In any event, some explanation would surely seem required why no mention was made of La Luz in the application of January, 1953, and why it was characterized merely as a prospective *operator* in the amendment of July 7, 1953. What puts a somewhat sinister color on what may have been merely an innocent mistake, if even that, is the possibility that La Luz ownership of a nearby hydroelectric power plant may have invalidated the calculations submitted to convince the SEC that the Rosita mine could not be profitably operated at that time, and that some of the directors of Tonopah or other persons having responsibility for the applications knew not only this but also the actual extent of development of an economically feasible refining process for the Rosita ore.[10] If either of these should be true, the fact that Lindsley and Northfield had only a slightly larger proportional interest in La Luz than in Frobisher would be no answer; the SEC, in all likelihood, would have insisted on a considerably higher price as a condition to permitting the sale. If in its applications Tonopah made "any untrue statement of a material fact" or omitted "to state therein any fact necessary in order to prevent the

10. By letter dated October 8, 1953, L. H. Bregy on behalf of Mines Incorporated informed the SEC that the company was working to find a "better and more economical method of treatment" for the Rosita ore. It can hardly be said, however, that he was encouraging about the prospects of success; without providing any details of the process under development, he said, "It can be definitely stated that a commercial process has not been developed at the present time, and that it will take a minimum of two or three years to do so, if it can be done at all."

statements made therein, in the light of the circumstances under which they were made, from being materially misleading," this would be "unlawful" under § 34(b) of the Investment Company Act and would provide a basis for imposing civil liability on those who were responsible for the statements or omissions or who profited therefrom with knowledge of the falsity. See Brown v. Bullock, 194 F.Supp. 207, 231 (S.D.N.Y.), aff'd, 294 F.2d 415 (2 Cir. 1961) (en banc); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

We do not mean any of this to be taken either as indicating that plaintiff in fact has a winning case on the theory here discussed or that others of his theories may not have promise, at least as against some of the defendants. We have felt compelled to go this far into the merits only to show that the settlement should not have been approved over his opposition when there is such doubt whether there had been truly adversary discovery prior to the stipulation of settlement and he was afforded no opportunity for any thereafter.

■ We recognize that since "[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation", the court must not turn the settlement hearing "into a trial or a rehearsal of the trial"; and that the court "is concerned

with the likelihood of success or failure and ought, therefore, to avoid any actual determination of the merits." See Haudek, *supra*, 23 Sw.L.J. at 795 (footnotes omitted). Still, in passing on the settlement of a derivative suit, as on a compromise in a proceeding under Ch. X of the Bankruptcy Act, the judge must have "apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). We cannot say that, particularly in light of the reasoned objections of the plaintiff, as well as of other stockholders, the court did that here. No one would think of applying to the presentation of plaintiff's former attorney at the hearing in this case the characterization of "thoroughness, thoughtfulness and disinterested judgment," which Judge Wyzanski used in approving the settlement in Cherner v. Transitron Electronic Corp., 221 F.Supp. 48, 51 (D.Mass.1963).[11] The plaintiff, through his new counsel, and the other objectors should be allowed to delve somewhat more deeply into the merits of this action; whether this should be done by further discovery, or by taking evidence in open court, or by both, is for the district court to determine in the exercise of sound discretion. While a remand may well result in renewed approval of the settle-

11. We are not overly impressed with the observation, [1970–71 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 92,922, at 90,415, that plaintiff would face serious difficulties of proof because the only living members of the Tonopah board involved in the transaction, at suit are defendants McWilliams and Lindsley; that the latter is old, ill and almost deaf; and that because of Tonopah's dissolution in 1965 many of its documents cannot be located. Our recital shows that plaintiff was not far from making a *prima facie* case solely on the basis of the few documents that were discovered; if the distance should be narrowed, for example, by further discov-ery of documents or by testimony of mining engineers that the process ultimately adopted was known all along, and that, particularly with the power resources of La Luz available, the Rosita mine had much better possibilities than were represented to the SEC, the handicaps arising from unavailability of Tonopah's directors would weigh more heavily on the defendants than on the plaintiff. Furthermore, whatever the state of Tonopah's files, there is no indication that those of Frobisher, Mines, La Luz, and the now merged Falconbridge and Ventures are not available.

ment,[12] this should come only after thorough consideration of what the parties will present although "less than a trial." See Isaacs v. Forer, 39 Del.Ch. 105, 159 A.2d 295, 296 (1960).

The order is reversed and the cause remanded for further consistent proceedings.

12. Judge Ryan gave little weight to the defense of limitations, and it was not seriously pressed on appeal. Those supporting the settlement are free to give consideration to the questions raised by Judge Cooper in his 1969 opinion and to make more of the defense on remand if they legitimately can. See generally Note, The

Statute of Limitations in Stockholders' Derivative Suits against Directors, 39 Colum.L.Rev. 842 (1939).