J. Ralph SAYLOR, Plaintiff,

v.

Philip BASTEDO et al.,
Defendants-Appellees,

Robert Saylor et al., Movants-Appellants,

Michael J. McLaughlin,
Objector-Appellant,

and

Abraham I. Markowitz, Appellee.

No. 936, Dockets 79–7570, 79–7606.

United States Court of Appeals,
Second Circuit.

Argued April 9, 1980.

Decided May 23, 1980.

Avrom S. Fischer, Brooklyn, N. Y., for executors-appellants.

Richard Steel, New York City (Gerard J. O'Brien, New York City, of counsel), for objector-appellant.

James W. Harbison, Jr., New York City (Morgan, Lewis & Bockius, New York City, Herbert J. Jacobi, and Thomas R. Stritter, New York City, of counsel), for defendants-appellees.

Abraham I. Markowitz, New York City, appellee pro se.

Before FRIENDLY, FEINBERG and TIMBERS, Circuit Judges.

FRIENDLY, Circuit Judge:

In the principal order here under review, Judge Tenney, in the District Court for the Southern District of New York, sought to end this derivative action brought in 1965 by J. Ralph Saylor, a stockholder of The Tonopah Mining Company of Nevada (Tonopah). The judge's main tool for accomplishing this seemingly salutary result was to find, 82 F.R.D. 440 (1979), that the action was subject to dismissal *sua sponte* for want of prosecution. However, in lieu of dismissal he approved a $250,000 settlement, including a fee of $83,000 and expenses of $1,313.73 for Saylor's original attorney, Abraham I. Markowitz, which this court had previously remanded for further consideration, 456 F.2d 896 (2 Cir. 1972), in light of its possible inadequacy and for other reasons stated in our opinion—a consideration which it has never received. Although sympathizing with the judge's frustration at the apparent interminability of this litigation, we believe that he failed to accord proper procedural opportunities to the plaintiff and placed on the plaintiff blame that should have been otherwise allotted. We therefore reverse his disposition in order that further expeditious proceedings may be had under his energetic super-

vision. In the course of our decision we must review two other rulings, of which more hereafter.

The history of the litigation until 1972 is recounted in our previous opinion with which familiarity is assumed, 456 F.2d at 897–99. We shall first summarize the holding and what led to it, and then set forth the subsequent developments in the district court.

As indicated, this derivative action was filed on February 18, 1965 by appellee Abraham I. Markowitz, an attorney, on behalf of J. Ralph Saylor, a stockholder of The Tonopah Mining Company of Nevada (Tonopah), a company registered under the Investment Company Act of 1940. The complaint alleged that controlling stockholders caused Tonopah to sell in two stages, effected in 1951 and 1953 respectively, its subsidiary Tonopah Nicaragua Company (Tonopah Nicaragua), owner of the Rosita copper mine in Nicaragua, for grossly inadequate consideration, $475,000,[1] to Mines Incorporated (Mines), an affiliate of Tonopah under § 2(a)(3) of the Act, and arranged the subsequent transfer of the Rosita mine to La Luz Mines Ltd. (La Luz), a Canadian corporation also an affiliate of Tonopah and the owner of the only available source of necessary hydroelectric power in the vicinity of the mine. This transaction was challenged on numerous grounds including an allegation that the now deceased defendant, Thayer Lindsley, who held substantial interests in the bevy of corporations involved in the transfers, had caused Tonopah to violate its obligations under the federal securities law by failing to disclose material facts in its applications to the SEC under § 17(b) of the Act for exemptions necessary to the sale, and the claim that Lindsley and his associates had breached their fiduciary obligations as officers and directors of Tonopah.

On September 24, 1970, Markowitz, without authorization from Saylor, entered a stipulation of settlement with the various defendants which, after a hearing, was approved by Judge Ryan over the protestations of Saylor, represented as objector by Lillian Eichman, as well as those of two objectors, Michael J. McLaughlin, represented by Gerard J. O'Brien, and his sister, Roseanne Horn, represented by Avrom S. Fischer, who was also of counsel to Ms. Eichman in representing Saylor. *Saylor v. Lindsley*, [1970–71 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 92,222 at 90,410 (S.D.N.Y.1971). The settlement provided that after payment of $84,313.73 in counsel fees and expenses to Markowitz, Tonopah was to receive $165,686.27[2] for terminating claims with a face value of many millions of dollars and, in one instance at least, with sufficient support in the sparse record to prompt this court to observe that "plaintiff was not far from making a *prima facie* case," 456 F.2d at 904 n. 11. Without resolving on appeal all the disputes that attended the settlement negotiations, we noted certain indicia that the conflict of interest between attorney and client inherent in the "facts of class action life", 456 F.2d at 501, may have tempered Markowitz's enthusiasm for vigorous representation once early settlement, even for an unduly small amount, and the concomitant receipt of attorney's fees seemed feasible. Among these were the objection to the settlement by the stockholder-plaintiff, the flawed notice of the settlement terms to Tonopah shareholders, Markowitz's failure to advise his client formally of the settlement until after direction of a hearing and approval of notice by the district court, the apparently self-serving character of much of Markowitz's discovery, and his failure to serve two Canadian corporations which apparently were key defendants, La Luz and Falconbridge Nickel

---

1. Allegedly the Rosita Mine realized net operating profits of $38,660,000 between 1959 and 1969, see 456 F.2d at 902.

2. Since an unserved defendant, Falconbridge Nickel Mines, Ltd. (Falconbridge), held 74% of Tonopah's shares at the time of the latter's dissolution, only some $57,000 would go to Tonopah's independent stockholders, see 456 F.2d at 898.

Mines, Ltd.[3] *Id.* at 899–901. On the basis of these factors and the apparent strength of plaintiff's case, we remanded to Judge Ryan with the instructions that

> plaintiff, through his new counsel, and the other objectors should be allowed to delve somewhat more deeply into the merits of this action; whether this should be done by further discovery, or by taking evidence in open court, or by both, is for the district court to determine in the exercise of sound discretion. *Id.* at 904.

While recognizing that our remand might result in renewed approval of the settlement, we noted that "this should come only after thorough consideration of what the parties present," *id.* at 905, since in passing on the settlement of a derivative suit,

> the judge must have "apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968). *Id.* at 904.

On June 14, 1972, promptly after the remand, Judge Ryan scheduled a conference to consider motions by Saylor and Horn for leave to serve process on the Canadian defendants, La Luz and Falconbridge, which attorney Markowitz had not served during the seven years of litigation, and to take discovery against all defendants, Canadian and American. At the conference, Markowitz announced for the first time that he had recently served La Luz and Falconbridge,[4] and the court postponed consideration of discovery against these parties pending their response. As against the American defendants, however, the court granted permission to inspect numerous documents then in the possession of defendants' counsel and to serve interrogatories if these should prove incomplete. At the same conference, defendants announced plans to recall previously deposed witnesses in order to amplify their earlier testimony—a proposal to which the judge responded with a request that all parties first complete discovery on new matters. The court-sanctioned document inspection must have been close to completion by July 14, 1972, since on that date plaintiff's counsel served interrogatories on both Canadian and American defendants requesting an inventory of documents relating to various aspects of the Rosita mine transaction.

Despite this energetic beginning, discovery soon stalled. In July 1972, the two recently-served Canadian defendants, La Luz and Falconbridge, moved for dismissal of the complaint as against them, *inter alia,* for failure to prosecute during the preceding seven years. In August 1972, they requested permission to postpone answering interrogatories until after disposition of their dismissal motion. The remaining Canadian defendant, Ventures, moved for dismissal as against it during the following year. In addition, during September or early October 1972, objector McLaughlin, who has served as a gadfly to defendants, judges, and plaintiff's attorneys alike,[5] precipitated a crisis in the litigation by attempting to exercise the power of attorney which he held for plaintiff Saylor and objector Horn in order to substitute a new law firm for all four counsel who then served on the plaintiff's side of the bar: Markowitz,

---

**3.** La Luz, the eventual recipient of the Rosita Mine, was controlled by another Canadian corporation, Ventures, Ltd., at the time of the transaction. In 1961, Falconbridge acquired Venture's assets and assumed its liabilities in exchange for Falconbridge stock. For a more detailed account of the participants in the transaction, see *Saylor v. Lindsley, supra,* 456 F.2d at 901–03.

**4.** In 1973 Markowitz also served process on the remaining Canadian defendant, Ventures, Ltd., see note 3 *supra.*

**5.** McLaughlin, who has been a passionate advocate of this action from the outset but could not become a plaintiff since he had not been a Tonopah stockholder at the time of the sale of the mine, see F.R.Civ.P. 23.1, held a power of attorney for plaintiff Saylor and also spoke for his sister objector Horn. As the account *infra* demonstrates, McLaughlin's efforts to control the litigation have themselves been a significant cause of delay.

Fischer, Eichman, and McLaughlin's own attorney, Gerard J. O'Brien. Without detailing the history of McLaughlin's motion, it suffices to note that at a hearing on October 26, 1972, Judge Ryan strongly urged the new firm to withdraw, which it did. Internecine struggle between McLaughlin and the lawyers continued throughout the following year and led in short order to the appearance and withdrawal of two additional law firms on behalf of Saylor at McLaughlin's behest. It was not until November 23, 1973, a year and a half after our remand, that the configuration of counsel and clients finally stabilized. Fischer became attorney of record for objector Horn as well as for Saylor both as objector and as plaintiff; O'Brien continued as McLaughlin's counsel; but Markowitz retained a foothold in the litigation through his appointment by Judge Ryan as attorney for the "class" of Tonopah shareholders.

During this year of wrangling on the objector's side, and indeed for several years thereafter, all parties appear to have abandoned discovery relating to the settlement itself and focused on the Canadian defendants' motion for dismissal. Appellants' explanation for this is that Judge Ryan orally stayed all discovery on the settlement until disposition of the dismissal motion. In support of this claim, Saylor's executors or, more realistically, attorney Fischer, point to a 1979 affidavit to that effect filed by McLaughlin's attorney and to the failure of the American defendants to answer plaintiff's 1972 interrogatories until 1977. Defendants counter that on November 8, 1973, Judge Ryan did indeed adjourn discovery as against the Canadian defendants, but that a stay was neither requested by nor granted to the American defendants. Plaintiff fails to explain why the district court would have wished to stay all discovery when the only motion on the record concerned the Canadian defendants. On the other hand, defendants proffer no explanation, why on their version, the 1972 interrogatories to the American defendants were not answered for five years. Absent any transcript of the proceedings we cannot determine where the truth lies.

Skirmishing over the motions to dismiss on the part of the Canadian defendants continued through the late fall of 1973, when the court, acting pursuant to a stipulation between Markowitz and the defendants, adjourned the dismissal motions themselves in order to permit discovery on the issues that they raised. Two sets of interrogatories relating to these motions were filed by Markowitz and Fischer during October and November of 1973, which the Canadian defendants answered during April and May, 1974.

Beginning on January 18, 1974, presumably because Judge Ryan had ceased to conduct an active calendar, the case was reassigned three times within fourteen months, moving to two other judges before assignment to Judge Tenney on March 6, 1975. During this peripatetic phase, little progress was achieved other than the return of the interrogatories bearing on the motion to dismiss, a further exchange of memoranda on that motion, and the frustration of renewed efforts on the part of McLaughlin to replace Fischer as attorney-of-record for plaintiff Saylor.

After the assignment to Judge Tenney in March, 1975 some progress began. At his suggestion all papers on the Canadian defendants' motions to dismiss were withdrawn, new papers were filed, and the motions were resubmitted on March 31, 1975. In a decision dated May 18, 1976, the district court dismissed the complaint as against La Luz, Falconbridge and Ventures for failure to prosecute during the 1965–1972 period when process had not been served on these defendants. See *Saylor v. Lindsley*, 71 F.R.D. 380 (S.D.N.Y.1976). Immediately thereafter, plaintiff and objectors sought certification to appeal under 28 U.S.C. § 1292(b). Judge Tenney denied this some four months later, on September 4, 1976. In the meantime, however, the principal individual defendant in the case, Thayer Lindsley, died. On September 7, 1976, Saylor's attorney made a timely motion to substitute Lindsley's executors, appellees Philip Bastedo and George H. Lenci.

This unopposed motion was granted, but not until six months later, on March 30, 1977. The record fails to reveal any discovery activity by any party during the year following the disposition of the Canadian defendants' motion to dismiss. Defendants ascribe this to the attorneys for plaintiff and the objectors, while the latter point to Lindsley's death and the attendant delay in the substitution of his executors.

The hiatus ended on April 12, 1977, when the American defendants including Lindsley's executors finally responded to plaintiff's interrogatories that had been filed pursuant to Judge Ryan's instructions almost five years earlier. Defendants offer no explanation for their belated response but pointedly maintain that the documents inventories in their answers have never been sought by plaintiff-objectors. The pace of discovery seemed to quicken in May, 1977, when plaintiff's attorney filed notice of intent to depose four witnesses but, true to this action's rocky course, the planned depositions were soon sidetracked by yet another diversion, on this occasion a petition by objector McLaughlin, filed on July 15, 1977, to intervene as a party, file a supplemental and amended complaint and add a new defendant. An exchange of briefs between defendants and McLaughlin followed. The court rejected McLaughlin's petition on February 23, 1978, in an opinion reflecting understandable concern with both McLaughlin's tactics as "the self-acknowledged *provocateur* in this now twenty-year-old litigation" and the prospects of ever bringing the action to a close. *Saylor v. Bastedo*, 78 F.R.D. 150 (S.D.N.Y.1978). The opinion took effective steps to expedite matters by establishing a six-month deadline for the completion of all discovery under the supervision of a United States Magistrate and by undertaking to schedule a settlement hearing immediately thereafter. *Id.* at 153.

Under the firm guidance of Magistrate Jacobs, plaintiff's attorney succeeded in deposing four witnesses by mid-July, 1978.[6] Simultaneously, defendants sought to depose Saylor, McLaughlin and Horn. McLaughlin and Horn answered interrogatories and cooperated in document discovery, but refused depositions on grounds of ill health. However, defendants' attempt to depose Saylor ran afoul of a truly fatal obstacle, namely, the disclosure that he had died some three years earlier, in September, 1975. Saylor's attorney, Fischer, who had been appointed over Saylor's objection, claimed to have had no occasion to contact Saylor or learn of his death before attempting to arrange the deposition.

On July 26, 1978, shortly after learning of Saylor's death, defendants, pursuant to F.R. Civ.P. 25(a)(1), served a suggestion of death on the record. Ninety days later, at the last moment before the expiration of the deadline established by the rule, Fischer moved to substitute Saylor's executors, his two sons Robert and Clyde Saylor, and his son-in-law, Robert Barr. Defendants responded by moving to stay decision of the motion to substitute pending discovery against the Saylor executors. Over plaintiffs' opposition, Robert Saylor was deposed on behalf of himself and his co-executors on January 10, 1979. Thereafter, defendants contested the motion to substitute on the grounds that the executors had failed to produce stock certificates which would establish that Saylor had not disposed of his Tonopah shares in an unrecorded transfer prior to his death, and that, in any event, the court should exercise its discretion to deny substitution in light of the fact that Saylor's estate was already settled, the long delay in ascertaining Saylor's death, the apparent lack of interest of the Saylor executors, and the role of McLaughlin in persuading them to apply for substitution. Finally, on May 15, 1979, the district court seemingly denied the motion to substitute

---

**6.** Plaintiff also sought but later abandoned the depositions of two other witnesses. One of these abandoned depositions, that of the former general manager of the La Luz hydroelectric facilities, developed into a major dispute when plaintiff was denied an advance of expenses to travel to Bermuda for the deposition and subsequently sought to block it entirely.

in the exercise of discretion.[7] *Saylor v. Bastedo, supra*, 82 F.R.D. 440. Although this was the only matter before the court, Judge Tenney held that the action was dismissible *sua sponte* for want of prosecution under Fed.R.Civ.P. 41(b), but, in lieu of dismissal, reinstated the settlement so that the Tonopah stockholders—and attorney Markowitz—might receive at least what the settlement provided. After reviewing the history of the litigation and noting the propensity for "procedural wrangling" manifested by plaintiff and the objectors, the court concluded that there had been no serious attempt to "delve" into the merits of the settlement as this court had instructed plaintiff to do in its 1972 remand. This fact alone, the court reasoned, would support *sua sponte* dismissal; hence the milder sanction of dismissal coupled with reinstatement of the 1970 settlement was *a fortiori* within the powers of the court. *Id.* at 443–44.

On appeal, Saylor's executors challenge both the 1976 decision dismissing the complaint against the Canadian defendants and the 1979 decision denying substitution and dismissing the action. Since the last is clearly a final decision under 28 U.S.C. § 1291, the other orders are subject to review, see 5 Moore, Federal Practice ¶ 41.-11[2] at 41–148 n. 55 (1979), 9 Moore, *supra*, §§ 110.07, 110.08[1], as indeed the order denying substitution would probably have been in any event, see 3B Moore, *supra*, ¶ 25.03[2] at 25.29.

## DISCUSSION

■ Judge Tenney's decision *supra*, 71 F.R.D. 380, to grant the motions of the Canadian defendants for dismissal of the action against them under F.R.Civ.P. 41(b) for failure to prosecute was well within his discretion, see *Theilmann v. Rutland Hospital, Inc.*, 455 F.2d 853 (2 Cir. 1972). He ably formulated the reasons for dismissal and we have nothing useful to add.

■ In denying the motion to substitute Saylor's executors for the deceased plaintiff, the court relied on the use of the word "may" in F.R.Civ.P. 25(a)(1)[8] and the explanatory statement in the 1963 Advisory Committee Notes proposing the present rule:

A motion to substitute made within the prescribed time will ordinarily be granted, but under the permissive language of the first sentence of the amended rule ("the court may order") it may be denied by the court in the exercise of a sound discretion if made long after the death—as can occur if the suggestion of death is not made or is delayed—and circumstances have arisen rendering it unfair to allow substitution. Cf. *Anderson v. Yungkau*, [329 U.S. 482, 485, 486, 67 S.Ct. 428, 91 L.Ed. 436 (1947)], where it was noted under the present rule that settlement and distribution of the estate of a deceased defendant might be so far advanced as to warrant denial of a motion for substitution even though made within the time limit prescribed by that rule. Accordingly, a party interested in securing substitution under the amended rule should not assume that he can rest indefinitely awaiting the suggestion of death before he makes his motion to substitute.

The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of a summons, and may be served in any judicial district. Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

---

**7.** We say "seemingly' because although the opinion concludes by stating that "the motion to substitute pursuant to Rule 25(a)(1) is denied," 82 F.R.D. at 444, it observes elsewhere that the judge was not "required to invite litigation by refusing to substitute and leaving the matter in procedural limbo" and therefore would use his power to dismiss under F.R. Civ.P. 41(b), *id.* at 443. Perhaps the judge had in mind the considerations elaborated in note 9 *infra*.

**8.** This reads:
(a) Death. (1) If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties.

The judge apparently thought that the long delay in the prosecution of the action constituted "circumstances" that made it "unfair to allow substitution" of the executors of the deceased plaintiff.

▌ Although neither the language of the rule nor the Advisory Committee's discussion expressly limits the court's discretion to substitution of the representative of a deceased defendant, it is difficult to imagine a case where discretion might properly be exercised to deny a motion to substitute for a deceased plaintiff made within the rule's time limits. The principal reason for such a discretionary denial is to promote the prompt settlement and distribution of the estate of deceased defendants. Thus, in *Anderson v. Yungkau*, 329 U.S. 482, 485, 67 S.Ct. 428, 430, 91 L.Ed. 436 (1947), the Supreme Court observed of the then-current Rule 25(a), which required a motion for substitution to be made within a rigid, two-year period after a party's death, that even within that period the court might deny substitution for a party when the settlement and distribution of an estate were so far advanced as to warrant discretionary denial. But it scarcely lies in the mouth of a defendant to argue that substitution sought by the executors of a plaintiff in the hope of a recovery that might enlarge the estate should be denied because the burden of reopening the estate, which the applicant for substitution cheerfully seeks to assume, would be too great. Rights of defendants to protection against undue delay are safeguarded by F.R.Civ.P. 41(b); they do not merit further enlargement on the fortuitous death of a plaintiff and the consequent need of substitution under F.R.Civ.P. 25(a)(1). Perhaps this is one reason why the opinion below appears to be the only reported instance in which a timely motion to substitute has been denied on the ground that the court, in its discretion, has determined that substitution would be unfair. See 7A Wright & Miller, Federal Practice and Procedure, § 1955, at 660 (1972) & 1979 Pocket Part § 1955, at 309–10. A derivative action, in which the deceased plaintiff sues on behalf of the corporation, would seem a peculiarly inappropriate candidate for exercising discretion to deny substitution of the estate of a deceased plaintiff.[9]

▌ We are equally unpersuaded by defendants' alternative ground for denial of substitution, not passed upon by the district court, namely, that Saylor's executors have failed to carry the burden of proving that Saylor's Tonopah shares "devolved on [them] by operation of law," Fed.R.Civ.P. 23.1, by neglecting to produce the stock certificates that would definitively preclude the possibility of an unrecorded transfer of the shares prior to Saylor's death. Apart from raising the bare possibility of such a transfer, defendants do not really dispute the claim that the contested shares passed into Saylor's estate "by operation of law." Thus, their challenge is readily distinguisha-

---

9. See *Phillips v. Bradford*, 62 F.R.D. 681, 685 (S.D.N.Y.1974) ("[t]here is no reason of policy to terminate a derivative stockholder action because the plaintiff dies"). Although a derivative action in which no stipulation of settlement has been filed may be dismissed *sua sponte* when plaintiff dies without a qualified substitute or intervenor, see *Stephenson v. Landegger*, 337 F.Supp. 591 (S.D.N.Y.1971) (Tenney, J.), aff'd, 464 F.2d 133 (2 Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct. 520, 34 L.Ed.2d 488 (1972), even this is "troublesome" in light of plaintiff's status as representative of the corporation, *id.* at 594, cf. *Spring v. Webb*, 227 F. 481, 484–86 (D.Vt.1915). A stipulation of settlement in a derivative action triggers the court's responsibility under Fed.R.Civ.P. 23.1 to prevent "any prejudice to the corporate claim that might result from discontinuance of the suit," 7A Wright & Miller, Federal Practice and Proce-

dure § 1838 at 428 (1972). Here a disapproval of the settlement might make the corporation's claim far more attractive to qualified intervenors. Indeed, the corporation's board of directors or trustee in liquidation might be compelled to join the action on plaintiff's side rather than to allow the loss of a claim whose presumptive value exceeds the settlement figure. Cf. *Wolf v. Barkes*, 348 F.2d 994, 998 (2 Cir. 1965) (new derivative action for fraud or waste provides remedy against directors who compromise corporate claims). Considerations of this sort may have been what prompted Judge Tenney not to rest his action solely—or at all—on Rule 25(a)(1) and to speak of the "procedural limbo" that such a course would produce, see note 7 *supra*. Our disposition of the case makes it unnecessary for us to decide the consequences of a post-settlement denial of substitution in a derivative action.

ble from cases in which candidates for substitution sought to establish that their method of acquiring stock comported with the requirements of Rule 23.1 or that the deceased plaintiff's interest in the stock did not terminate at death. See *Hirshfield v. Briskin*, 447 F.2d 694 (7 Cir. 1971); *Phillips v. Bradford, supra*, 62 F.R.D. 681; *Stephenson v. Landegger, supra*, 337 F.Supp. 591. Defendants' argument, then, has little to do with the propriety of substitution *per se*; rather it boils down to the assertion that neither Saylor nor his executors could possess "shareholder" standing to prosecute this action without the Tonopah certificates in hand. At least as to the federal claims, Saylor himself could have withstood such an attack so long as he remained the undisputed record owner of the shares, a status that is not seriously disputed here. See *Orenstein v. Campusamp, Inc.*, 19 F.R.Serv.2d 466, 468 (S.D.N.Y.1974). We see no sufficient reason why a different outcome should be mandated when the same attack is directed against the executors and framed as an objection to substitution. The determination of which claims shall survive the death of the party is a function of the applicable substantive law and is wholly unaffected by Fed.R.Civ.P. 25(a). See 3B Moore, *supra* ¶ 25.04 (2d ed. 1979). We therefore reverse the order denying substitution of Saylor's executors—if such order in fact was made.

■ We turn then to the portion of the opinion wherein the court held that the action was dismissible *sua sponte* for want of prosecution and, in lieu of such dismissal, approved the settlement (including the payment to attorney Markowitz) which we had remanded for further consideration. *Link v. Wabash Railroad Co.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962), established that, despite the language of F.R.Civ.P. 41(b) providing for dismissal for failure to prosecute on motion of a defendant, courts have the inherent power "acting on their own initiative, to clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Id.* at 630, 82 S.Ct. at 1389. The Court said further "[n]or does the absence of notice as to the possibility of dismissal or the failure to hold an adversary hearing necessarily render such a dismissal void." *Id.* at 632, 82 S.Ct. at 1389. However, it proceeded to qualify this by stating that "[t]he adequacy of notice and hearing respecting proceedings that may affect a party's rights turns, to a considerable extent, on the knowledge which the circumstances show such party may be taken to have of the consequences of his own conduct." *Id.* at 632, 82 S.Ct. at 1390.

Here there is nothing to indicate that counsel for Saylor had any adequate notice that the court was contemplating the drastic measures taken in its opinion of May 16, 1979 of effectively dismissing the action for failure to prosecute, irrespective of its ruling on substitution. The court had set a timetable in its opinion of February 21, 1978, *supra*, 78 F.R.D. 153. Discovery with respect to the equity of the settlement was to be closed at the end of six months, i. e., on August 21, 1978, and the court undertook that, without action by the parties, it would take the initiative at the end of that period and "schedule a settlement hearing to consider the evidence that has been developed," *id.* Before that happened, the parties learned of Saylor's death and counsel made a timely motion for substitution in October 1978, which the court was unable to decide until May, 1979. The memorandum submitted by the defendants in opposition to substitution relied on arguments applicable to that issue alone and did not contend, as the district judge was later to decide, that the whole course of conduct subsequent to our remand made it appropriate to act under Rule 41(b) [10]—an argument to which plaintiff, as appears below, could have responded at least in some degree. So far as the record shows, at no time was

---

**10.** Although the memorandum concluded by saying that denial of the motion to substitute made the action "subject to immediate dismissal", there was no attempt to canvass the difficult question of the effect of denial of substitution on a derivative action in the posture of this one, which we have noted in fn. 9 *supra*.

counsel given any reason to think that the court was considering the severe action which it finally took as a means of avoiding a "procedural limbo", see notes 7 and 9, *supra*, rather than simply a denial of the motion for substitution which would have left the future status of the action subject to debate. This does not appear to us to comport with the procedural requirement for *sua sponte* dismissal implicitly recognized in *Link*. Cf. *Schenck v. Bear, Stearns & Co., Inc.*, 583 F.2d 58, 59 (2 Cir. 1978) (finding abuse of discretion in *sua sponte* dismissal where *inter alia* there was no request for dismissal, no pre-trial conference, and no "judicial participation indicating that a dismissal might be in the offing."). A conference might well have developed courses of action short of that actually taken which would have satisfied the court's proper desire to bring this litigation to an end.

Although reversal would be required on this ground, we also question whether the court was justified in assessing plaintiff's counsel with so large a share of the blame for the seven year delay since our remand. The attempt to serve the Canadian defendants was not unreasonable, particularly in light of our adverse comment, 456 F.2d at 901, on the previous failure to have done so and the aid which the presence of these companies as parties would have given to discovery, see F.R.Civ.P. 33 and 34. It was not the fault of plaintiff's present counsel that so many years elapsed before the Canadian defendants' motions to dismiss were decided. Similarly the long delay in concluding discovery looks quite different if this had been stayed, as to all defendants, pending disposition of the motions of the Canadian defendants for dismissal. Defendants, who took five years to answer the interrogatories propounded to them in July, 1972, are scarcely in a position to complain of plaintiff's delay. Moreover, these de-

fendants were always able to move that the court close discovery and give renewed consideration to the propriety of the settlement; their acquiescence in the course of proceedings, except for moving to dismiss the Canadian defendants and resisting the motion for substitution, gives a certain hollowness to their claims of prejudice through loss of oral testimony. The case also suffered from the many reassignments within the district court, and long delays in the decision of motions. In short there is blame enough here for everyone; it should not all have been laid at the door of plaintiff's present counsel. These considerations assume peculiar weight in the case of a derivative suit where the benefits of a sizable recovery or a larger settlement would inure to all stockholders, for whom the court has particular responsibility during proceedings bearing on a proposed settlement.[11] Fully recognizing that the discretion to dismiss belongs to the district court and not to the court of appeals, see *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642–43, 96 S.Ct. 2778, 2780–2781, 49 L.Ed.2d 747 (1976), we think that on the facts here, in light of our ruling that denial of substitution would have been improper, *sua sponte* dismissal for want of prosecution without notice and after the judge had already fixed a schedule, was an abuse or, as it is sometimes better phrased, a misuse of discretion. See *Finley v. Parvin/Dohrmann Co., Inc.*, 520 F.2d 386, 390 (2 Cir. 1975); *Buffalo Courier Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 59 n.18 (2 Cir. 1979).

The order approving the settlement in lieu of dismissal *sua sponte* is therefore reversed. The judge should promptly schedule a hearing at which the parties shall present the further evidence bearing on the fairness of the settlement which has been obtained through discovery since our

**11.** While our 1972 opinion placed on Saylor and the objectors the initial burden of discovery to document more fully their grounds for rejecting the settlement, see discussion *supra*, the ultimate burden was no less on defendants to provide an evidentiary foundation adequate to support the 1970 settlement. See 3B

Moore, *supra*, ¶ 23.1.24[2] at 23.1–138, 23.1–139. This allocation of responsibility distinguishes the posture of the instant case from ordinary pre-trial proceedings in which plaintiff bears primary responsibility for moving the case, see *Messenger v. United States*, 231 F.2d 328 (2 Cir. 1956), and its progeny.

remand and such other relevant evidence as they may choose to adduce. The judge shall then rule with all reasonable speed upon the fairness of the settlement in the light of the previous and supplemental records. Any unexcused failure by plaintiff to comply with the schedule set by the judge shall be sufficient ground for reinstatement of the order here reversed.

The cause is remanded for further proceedings in accordance with this opinion. No costs.