**Robert SAYLOR, et al., Plaintiffs,**

v.

**Philip BASTEDO, et al., Defendants.**

**No. 65 Civ. 516 (CHT).**

United States District Court,
S.D. New York.

Nov. 9, 1983.

23. James may of course appear either personally or by a lawyer admitted to practice.

Avrom S. Fischer, Brooklyn, N.Y., for plaintiffs.

Morgan, Lewis & Bockius, New York City (James Harbison, Herbert J. Jacobi, Thomas R. Stritter, New York City, of counsel), for defendants.

Pollack & Kaminsky, New York City (John Halebian, New York City, of counsel), for nominal defendant Tonopah Min. Co. of Nevada.

Pearlman, Apat, Kupillas & Futterman, Kew Gardens, N.Y. (Stephen Pearlman, of counsel), for Estate of Abraham I. Markowitz.

Richard Steel, New York City, for Michael McLaughlin.

## OPINION

TENNEY, District Judge.

This is a shareholder's derivative action brought on behalf of the Tonopah Mining Company of Nevada ("Tonopah") by J. Ralph Saylor ("Saylor"). Defendants seek court approval of a settlement agreement, entered into back in 1970, between Abra-

ham I. Markowitz, then Saylor's attorney, and the attorneys for the defendants. For the reasons discussed below, the motion for approval of the settlement is denied.

### History of the Case

This derivative action, filed on February 18, 1965, is based on Tonopah's sale of its subsidiary, Tonopah Nicaragua Company ("Tonopah Nicaragua"), to Mines, Inc. ("Mines"), an affiliate of Tonopah. Tonopah Nicaragua's principal asset was a copper mine in Nicaragua, known as the Rosita mine. The sale was effected in two stages: 60% of Tonopah Nicaragua's stock was sold to Mines in 1951, and the remaining 40% in 1953.

The complaint alleges that the defendants, several of Tonopah's directors and certain of its corporate affiliates, caused Tonopah to sell Tonopah Nicaragua for grossly inadequate consideration. The complaint further alleges that defendants subsequently arranged the transfer of the Rosita mine to La Luz Mines, Ltd. ("La Luz"), a Canadian corporation affiliated with Tonopah and the owner of the only available hydroelectric power source near the mine. According to the complaint, Tonopah, Mines, and La Luz were all under defendants' domination and control, and defendants arranged for these transfers for their personal financial benefit. Moreover, plaintiffs[1] charge defendants with material misrepresentations and omissions to the SEC in connection with the sale. Plaintiffs allege that these acts violated provisions of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.;* the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.;* and the Investment Company Act of 1940, 15 U.S.C. § 80a–1 *et seq.*[2]

---

**1.** As used herein, the term "plaintiffs" refers to the stockholders; the term "plaintiff" refers to Saylor.

**2.** Specifically, plaintiff charges defendants with violations of § 17 of the 1933 Act, 15 U.S.C. § 77q; §§ 10(b), 29(b) of the 1934 Act, 15 U.S.C. §§ 78j(b), 78cc(b); Rule 10b–5, 17 C.F.R. § 240.10b–5; and §§ 1(b)(1), (2), (4), 34(b), 36 and 47(b) of the Investment Company Act, 15 U.S.C. §§ 80a–1(b)(1), (2), (4), 80a–33(b), 80a–35, and 80a–46(b).

Shortly after this action was commenced, defendants moved for summary judgment on the grounds that this action was barred by res judicata and the statute of limitations. An earlier shareholder's action, setting forth the same cause of action as this one, had been instituted in this court in 1957 and dismissed with prejudice in 1961 when the plaintiff failed to comply with a court order that he post a security bond. *Hawkins v. Lindsley,* No. 123–38 (S.D.N.Y. June 22, 1961 and July 27, 1961), *aff'd,* 327 F.2d 356 (2d Cir.1964). In deciding the summary judgment motion, the court did not reach the statute of limitations issue, but held that this action was barred under the doctrine of res judicata and granted summary judgment for defendants. *Saylor v. Lindsley,* 274 F.Supp. 253 (S.D.N.Y.1967) (Cooper, J.). That decision, however, was reversed on appeal, 391 F.2d 965 (2d Cir. 1968). Defendants subsequently renewed their motion for summary judgment on statute of limitations grounds. The court denied the motion, however, concluding that determination of the statute of limitations issue on a summary judgment motion was inappropriate in light of the factual questions involved. 302 F.Supp. 1174 (S.D. N.Y.1969).

During the following year, plaintiff's attorney, the late Abraham I. Markowitz ("Markowitz"), negotiated a settlement on plaintiff's behalf. That settlement—the same one that is before the Court today—provided that defendants would pay $250,-000 to Tonopah's shareholders less approximately $84,000 in legal fees and expenses for Markowitz. Since Falconbridge Nickel Mines, Ltd. ("Falconbridge"), originally named as a defendant in this action (see

The complaint also alleged state law claims for waste and breach of fiduciary duty, but those claims were dismissed as barred by the statute of limitations when plaintiffs failed to amend their complaint, to allege with specificity the circumstances of their claim of fraudulent concealment, within thirty days of Judge Cooper's order. *See* 302 F.Supp. 1174, 1187 (1969).

discussion, *infra* ), owned 74% of Tonopah's shares at the time Tonopah was dissolved, only $57,000 of the total settlement amount would go to independent shareholders. Judge Ryan approved the settlement, over plaintiff Saylor's objection.[3]

The court of appeals reversed Judge Ryan's order. 456 F.2d 896 (2d Cir.1972). The court held that although the assent of the complaining shareholder is not essential to settlement of a derivative suit, not enough had been done to protect the rights of the complaining shareholder in this suit. *Id.* at 899–900. Troubled by the circumstances of the settlement negotiations and the inadequacy of the discovery to that point, the court remanded the case to allow the plaintiff "to delve somewhat more deeply into the merits of this action ... by further discovery, or by taking evidence in open court, or by both." *Id.* at 904. The court recognized that "[w]hile a remand may well result in renewed approval of the settlement, this should come after thorough consideration of what the parties will present." *Id.* at 904–05 (footnote omitted).

The discovery called for by the court's opinion was delayed for some years, first, by a series of skirmishes among the objectors to the settlement and their attorneys; second, by a motion to dismiss made by La Luz and two other defendants, Falconbridge and Ventures, Ltd. ("Ventures"); and third, by reassignment of the case, three times within fourteen months, due to Judge Ryan's assuming senior status. In 1976, this Court dismissed the complaint as against La Luz, Falconbridge and Ventures for failure to prosecute during the 1965–72 period when process had not been served on those defendants. 71 F.R.D. 380 (S.D.N.Y. 1976), *aff'd,* 623 F.2d 230 (2d Cir.1980).

Then, in 1976, the principal defendant in this case, Thayer Lindsley, died. A timely motion to substitute his executors, Philip Bastedo and George H. Lenci, was granted. Discovery was further delayed by a motion to intervene made by Michael McLaughlin,

an objector to the settlement who could not become a plaintiff because he was not a Tonopah shareholder at the time of the transactions complained of. McLaughlin's motion was denied, *Saylor v. Bastedo,* 78 F.R.D. 150 (S.D.N.Y.1978), and the Court tried to expedite discovery by establishing a six-month deadline for the completion of discovery and appointing a magistrate to supervise discovery.

Thus it was not until 1978 that any substantial progress was made in discovery proceedings. In the first half of that year, plaintiff took a series of depositions. However, when defendants tried to depose Saylor, they were met with the disclosure that Saylor had died three years earlier. Defendants promptly filed a suggestion of death on the record as to Saylor, in accordance with Federal Rule of Civil Procedure ("Rule") 25(a). Ninety days later, just before expiration of the deadline established by Rule 25(a), plaintiff's executors moved for substitution. This Court denied the motion for substitution, and, rather than dismissing the action sua sponte for failure to prosecute over the preceding fourteen years, approved the 1970 settlement "in the absence of any evidence on which ... [to] modify or otherwise alter [its] terms." 82 F.R.D. 440, 444 (S.D.N.Y.1979).

On appeal, that decision was reversed. 623 F.2d 230 (2d Cir.1980). The court of appeals concluded that the motion for substitution should have been granted and that sua sponte dismissal for failure to prosecute, without notice and after a discovery schedule had been set, was a misuse of discretion. *Id.* at 239. The action was remanded for a hearing on the fairness of the settlement.

Discovery proceedings then resumed, under the supervision of Magistrate Nina Gershon. In 1982 Magistrate Gershon advised the Court that discovery had been completed and the parties were ready to go forward with the hearing on the fairness of the settlement. (Shortly thereafter, the Court

---

**3.** Saylor subsequently dismissed Markowitz and engaged other counsel. Judge Ryan then

appointed Markowitz "attorney for the class."

was informed that Markowitz, appointed by Judge Ryan as attorney for the class, had died.)

The parties have agreed to dispense with an evidentiary hearing and to have this Court base its determination on their briefs; the oral argument held on July 14, 1983; and the voluminous documents that they rely on in support of their respective positions—the last of which were finally submitted in May 1983.

## Background

Knowledge of the corporate interrelationships is necessary to fully understand the claims made in this action. Lindsley, through a company called Northfield Mines, Inc. ("Northfield"), owned about 30% of Ventures. Ventures owned approximately 13% of Tonopah; its ownership of Tonopah increased to 26% in 1951. Ventures also owned 69% of La Luz. (Tonopah owned about 8% of La Luz.) La Luz owned and operated a gold mine in Nicaragua, some thirty miles away from the Rosita mine. La Luz controlled the only feasible source of hydroelectric power in the area, and in connection with the gold mine's operations, had built a power plant at that site. Ventures owned 54% of Frobisher, Ltd. ("Frobisher"). Mines was a wholly-owned subsidiary of Frobisher.

Tonopah had long been aware that the Rosita mine had substantial copper reserves. However, the mine, which was in a remote location, had little value as long as the cost of mining, refining, and transporting the copper exceeded the market price of the metal. After a number of unsuccessful attempts to sell the Rosita mine in 1948–50, Tonopah agreed in 1950 to sell 60% of Tonopah Nicaragua's stock (Tonopah Nicaragua, whose only asset of significance was the mine, may be considered the mine's functional equivalent) to Mines for $210,000.

Because Tonopah and Mines were affiliated under § 2(a)(3) of the Investment Company Act, Tonopah had to apply to the SEC for an exemption from § 17(a) of the Act, which prohibits certain transactions between affiliates. Its application, originally filed in November 1950 and twice amended, was granted in April 1951. In late 1952, Tonopah agreed to sell to Mines the remaining 40% of the mine for $65,000 and 10,000 shares of stock in Falconbridge. (Ventures also owned about 61% of Falconbridge.) At the time, the Falconbridge shares had a market value of about $147,000. In an application to the SEC filed in January 1953, Tonopah requested an exemption for the second sale. According to the application, development of the Rosita mine would require a substantial investment, and Tonopah was unable to absorb its proportionate share. Rather than maintain a substantially diluted interest in a property that was not expected to yield dividends for several years, Tonopah decided to sell its remaining 40% of the Tonopah Nicaragua stock.

This application too was twice amended. In November 1953, the SEC granted an exemption for the second sale.

In February 1954, Mines transferred all of its Tonopah Nicaragua stock to Frobisher, its parent. In September of that same year Frobisher entered into an agreement to sell the stock to La Luz for approximately $516,000. The mine was conveyed to La Luz in January 1955. La Luz developed the mine site and constructed a plant to refine the copper. Initially, it operated the mine at a loss, but ultimately derived more than $20 million in profits from the mine.

La Luz was not mentioned at all in Tonopah's application to the SEC for an exemption for the first sale to Mines. The only reference to La Luz in the second application came in an amendment to that application dated July 7, 1953, which stated

Tonopah is the owner of 114,000 shares of the common capital stock of La Luz Mines, Ltd., a holding constituting approximately 8% of the La Luz outstanding shares of stock. Should the Application be granted and the sale of the Tonopah Nicaragua stock effected, and should thereafter the Rosita property be profitably operated, Tonopah would share in the profits as it is presently contemplated that a Management Contract would be

made with La Luz Mines, Ltd. for the operation of the Rosita property.

### Discussion

The single most important factor that a court must consider in deciding whether to approve a proposed settlement is the strength of the plaintiff's case, balanced against the amount of the settlement. *Plummer v. Chemical Bank,* 668 F.2d 654, 660 (2d Cir.1982) (citing *In re Traffic Executive Ass'n-Eastern R.R. v. Long Island R.R. Co.,* 627 F.2d 631, 633 (2d Cir.1980)); *see Weinberger v. Kendrick,* 698 F.2d 61, 73–74 (2d Cir.1982), *cert. denied sub nom., Coyne v. Weinberger,* —— U.S. ——, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Other factors that a court must consider include: the risks involved in the litigation if the settlement is not approved; the complexity, expense, and likely duration of that litigation; the good faith efforts of counsel in negotiating the settlement; the stage of the proceedings and the amount of discovery that has been completed; and the reaction of class members to the proposed settlement. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 465 (2d Cir.1974).

In evaluating the strength of plaintiff's case, a court should not undertake "the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 462. The very purpose of a settlement is to avoid a trial of the disputed issues. *Saylor v. Lindsley, supra,* 456 F.2d at 904. The court " 'is concerned with the likelihood of success or failure and ought, therefore, to avoid any actual determination of the merits.' " *Id.* (quoting Haudek, The Settlement and Dismissal of Stockholders' Actions—Part II: The Settlement, 23 Sw.L.J. 765, 795 (1969)).

Nevertheless, the Court is required "to make a considered and detailed assessment of the reasonableness" of the proposed settlement. *Weinberger v. Kendrick, supra,* 698 F.2d at 82. And in order to balance the strength of plaintiff's case against the terms of the settlement, a judge "must 'apprise[ ] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.' " *Id.* at 74 (quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968)). It seems to this Court that the facts deserve particularly careful scrutiny in a case such as this one, where the complaining shareholder objects to the settlement.

With these considerations in mind, the Court turns to the arguments advanced by the parties in support of their respective positions. Plaintiffs object to the proposed settlement.[4] Briefly stated, their argument is that they would succeed in obtaining a substantial recovery if the case went to trial, because (1) the price paid by Mines was grossly inadequate in view of the profits—of more than $20 million—ultimately returned by the mine, and the logistical advantage that La Luz, the ultimate transferee, had in its operation; (2) defendants' failure to disclose to the SEC La Luz's role in the transaction, and the existence of a commercially feasible refining process were material omissions of fact; (3) the statute of limitations was tolled by defendants' adverse domination of the Tonopah board of directors and/or by their fraudulent concealment of the claim; and (4) there is a private right of action under the Investment Company Act.

Defendants, on the other hand, support the settlement.[5] They argue that the settlement is fair and reasonable when measured against the likely outcome of a trial, because (1) the price paid by Mines, Inc. for the Rosita property was fair and reasonable; (2) full and adequate disclosure of the material facts of the transactions in ques-

---

**4.** Michael McLaughlin joins plaintiffs in objecting to the settlement.

**5.** Attorneys for Markowitz's estate have indicated by letter to the Court that they are in favor of the proposed settlement, as has the attorney for the now defunct Tonopah Mining Co.

tion was made to the SEC; (3) plaintiffs' claim is barred by the statute of limitations, in the absence of any proof of adverse domination; and (4) a private right of action under the Investment Company Act is of "doubtful validity," and, even if valid, could lead to the recovery of only limited damages.

At the outset, the Court will address defendants' arguments that plaintiffs' claims are barred by the statute of limitations, and that the existence of a private right of action under the Investment Company Act is doubtful.

*Statute of Limitations*

Plaintiffs' cause of action accrued, at the latest, in 1955 when the Rosita mine was transferred to La Luz. There is no dispute that the applicable limitations period is six years. Since this action was not filed until February 18, 1965, it is time-barred unless the statute of limitations was tolled for a considerable part of the intervening period.

 Plaintiffs advance the federal equitable doctrine of adverse domination as a basis for tolling the statute.[6] It is well settled that the running of the statute of limitations may be suspended by a period of adverse domination of the injured corporation by the wrongdoers. *See ITT, An Int'l Investment Trust v. Cornfeld,* 619 F.2d 909, 930–31 (2d Cir.1980); *International Railways of Central America v. United Fruit Co.,* 373 F.2d 408 (2d Cir.), *cert. denied,* 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967).

The rationale [of the doctrine of adverse domination] is that if the wrongdoers by virtue of their control of corporate decisionmaking have foreclosed the possibility that the corporation might bring suit, then they should not reap benefit from their position of domination and during such time the corporation should not be held to account for the delay in instituting suit.

*Saylor v. Lindsley,* 302 F.Supp. at 1184. However, "a plaintiff who seeks to toll the statute on the basis of domination of a corporation has the burden of showing 'a full, complete and exclusive control in the directors or officers charged.'" *International Railways of Central America v. United Fruit Co., supra,* 373 F.2d at 414 (quoting *Payne v. Ostrus,* 50 F.2d 1039, 1042 (8th Cir.1931)). This means "at least that once the facts giving rise to possible liability are known, the plaintiff must effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue." *Id.*

Plaintiffs claim that the Tonopah board was "dominated and controlled" by Lindsley "and his corporate affiliates, Ventures and La Luz" from 1934 until Tonopah's liquidation. Plaintiffs' Memorandum in Opposition to Judicial Approval of the Proposed Settlement ("Plaintiffs' Memorandum"), at 50. However, we are concerned here with the years of, and subsequent to, the transactions in dispute.

The composition of Tonopah's board of directors, from 1950 until the company's dissolution in 1964, was as follows:[7]

---

**6.** Plaintiffs have also advanced the doctrine of fraudulent concealment as a basis for tolling the statute. At the hearing on this motion, the Court denied plaintiffs' application to amend the complaint to state a claim for fraudulent concealment, in view of the age and status of this case. Subsequent to that hearing, however, plaintiffs' attorney brought to the Court's attention his affidavit, dated in 1975, in which he requested leave to amend the complaint. Apparently, the affidavit was filed but not docketed or otherwise brought to the Court's attention at that time. (It was, however, included as part of the appendix in the 1980 appeal.) In light of this circumstance, the Court feels that plaintiffs' request to amend deserves further consideration. Accordingly,

the Court will permit plaintiffs to renew their motion for leave to amend the complaint, within 14 days of the date of this opinion, and will give consideration to their application as well as defendants' response thereto. Any proposed amendment, however, must "show with specificity the circumstances of the alleged fraudulent concealment *and its discovery.*" 302 F.Supp. at 1187 (emphasis added). As far as the Court is aware, the record does not show when Saylor is alleged to have discovered the fraud.

**7.** The 1951 sale to Mines, Inc. of 60% of the Tonopah Nicaragua stock was approved by Tonopah's board of directors on July 27, 1950. The members of Tonopah's board at that time

1950: C.R. Alexander, F.H. Haehnlen, T. Lindsley, G.W. McDougal, J.W. McWilliams, C.H. Nonamaker, and G.W. Tower

1951–52: C.R. Alexander, L.H. Bregy, F.H. Haehnlen, T. Lindsley, G.W. McDougal, J.W. McWilliams, and C.H. Nonamaker

1953: C.R. Alexander, L.H. Bregy, F.H. Haehnlen, J.W. McWilliams, C.H. Nonamaker, and G.D. Stott (G.W. McDougal died during the year.)

1954–56: C.R. Alexander, L.H. Bregy, F.H. Haehnlen, J.W. McWilliams, C.H. Nonamaker, G.D. Stott, and P.W. Zeckhausen

1957: C.R. Alexander, F.H. Haehnlen, J.W. McWilliams, C.H. Nonamaker, G.D. Stott, W.H. Wright, and P.W. Zeckhausen

1958–60: C.R. Alexander, J.W. McWilliams, C.H. Nonamaker, G.D. Stott, W.P.H. Townsend, W.H. Wright, and P.W. Zeckhausen

1961–63: J.W. McWilliams, J.T. McWhirter, G.D. Stott, W.P.H. Townsend, T.N. Woodrooffe, W.H. Wright, and P.W. Zeckhausen

Annual Reports of the Tonopah Mining Company of Nevada, for the years 1950–1963.

Plaintiffs do not even suggest certain of Tonopah's directors, specifically Stott, a stockbroker from the A.G. Edwards firm,

McDougal, or Townsend, were involved in any wrongdoing or dominated by adverse interests. McDougal was on the board until his death in 1953; Stott was on the board from 1953 until Tonopah's liquidation; Townsend joined the board in 1958.

On the other hand, the affiliation with, or interest in, Ventures and/or La Luz by certain of the Tonopah directors cannot be denied. Of course, Lindsley, through Northfield, owned 30% of Ventures. After 1950, Mrs. Haehnlen owned a large block of La Luz stock. Tower, Bregy, Zeckhausen, McWhirter, Woodrooffe, and Wright were all, at one time, officers or directors of Ventures or La Luz. However, tolling by proof of adverse domination requires proof of full, complete and exclusive control. The fact that La Luz and Ventures had a number of different representatives on the Tonopah board over the years does not necessarily mean that at any one time the board was dominated by adverse interests. It must be emphasized that these individuals were not all on Tonopah's board at the same time. Lindsley's tenure as a director terminated in 1952. Zeckhausen did not come on the board until 1954. Wright replaced Bregy in 1957. McWhirter and Woodrooffe did not come on the board until 1961. Thus, a brief review of the composition of Tonopah's board of directors in the years following the sale to Mines makes it apparent that a determination of Lindsley's

were Lindsley, Mrs. F.H. Haehnlen, G.W. Tower, C.R. Alexander, G.W. McDougal, J.W. McWilliams, and C.H. Nonamaker. Neither Tower nor Lindsley attended the July 27, 1950 meeting at which the sale was approved. Minutes of the Meeting of the Board of Directors of Tonopah, held on July 27, 1950 (Exh. 2 to Deposition of Paul Z. Zeckhausen, held on March 27, 31 & April 1, 1970 ("Zeckhausen 1970 Dep.")). The five directors who attended that meeting approved the sale. Mrs. Haehnlen, who acquired a block of La Luz stock shortly thereafter, could be deemed an interested party. However, McDougal was clearly not dominated by Lindsley, and plaintiffs do not even suggest otherwise. Alexander, Nonamaker and McWilliams had no readily apparent interest in the transaction. *See* discussion in text.

The 1953 sale to Mines of the remaining 40% of the Tonopah Nicaragua stock was approved

by the Tonopah board of directors on December 30, 1952. The members of the board of directors at that time were Lindsley, Mrs. Haehnlen, L.H. Bregy, Alexander, McDougal, McWilliams, and Nonamaker. Lindsley did not attend the meeting and Bregy, who was purchasing agent for La Luz in New York, did not vote. Minutes of the Meeting of the Board of Directors of Tonopah, held on December 30, 1952 (Exh. 2 to Zeckhausen 1970 Dep.). The other five directors approved the sale. As discussed above, of those five, Mrs. Haehnlen was the only obviously interested party, since she owned stock in La Luz.

Of course, proof that the majority of the directors who approved the sales were disinterested would not absolve all of the defendants from the charge of self-dealing in violation of Rule 10b–5, unless those directors were fully informed as to all material aspects of the transactions. *See infra* note 8.

or Ventures' domination of three men—McWilliams, Nonamaker, and Alexander—and the nature of their involvement in the disputed transactions—is vital to a determination of whether the statute of limitations was tolled by adverse domination.

There is no evidence that any of these men derived any financial benefit from the sale of the mine. Nonamaker had been assistant secretary to La Luz, but his affiliation with La Luz apparently ended more than two years before the first of the two sales to Mines. Moreover, he had a long-standing relationship with Tonopah. Plaintiffs make no specific allegations regarding Alexander. And their claim that McWilliams was dominated by Lindsley simply because he was a member of the law firm retained to represent Tonopah must be rejected, absent a claim that McWilliams acted improperly in exchange for retention of his firm as Tonopah's counsel, or for some other *quid pro quo*. *See Maldonado v. Flynn,* 597 F.2d 789, 794 (2d Cir.1979).

 In short, there is little to support plaintiffs' claim that these men were dominated by Lindsley's interests. However, the inquiry does not end there. For even in the absence of an obvious interest in the transaction, the possibility exists that for other less obvious reasons, these men participated, or at least acquiesced in, misrepresentations to the SEC. If, at the time of the SEC applications, they were aware that the mine would ultimately be transferred to La Luz, it is highly unlikely that a shareholder could have persuaded them to bring suit.[8] Accordingly, the question of adverse domination cannot be considered apart from the question of plaintiffs' likelihood of success on their main claims, and cannot, as defendants suggest, serve as an independent basis for approving the settlement.

*Investment Company Act*

The Second Circuit, in remanding the case to permit further discovery, stated

If in its applications Tonopah made "any untrue statement of a material fact" or omitted "to state therein any fact necessary in order to prevent the statements made therein, in light of the circumstances under which they were made, from being materially misleading," this would be unlawful under § 34(b) of the Investment Company Act and would provide a basis for imposing civil liability on those who were responsible for the statements or omissions or who profited therefrom with knowledge of the falsity. See *Brown v. Bullock,* 194 F.Supp. 207, 231 (S.D.N.Y.), aff'd, 294 F.2d 415 (2 Cir.1961) (*en banc*); *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

456 F.2d at 903–04. However, defendants, arguing in support of the proposed settlement, claim that a private right of action under the Investment Company Act is of "doubtful validity." Citing *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)—a case that deals with implied private rights of action under the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1 *et seq.*—defendants claim that the legislative scheme of the Investment Company Act indicates that no implied private right of action was intended.

In *Fogel v. Chestnutt,* 668 F.2d 100 (2d Cir.1981), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982), the Second Circuit permitted recovery of damages on a claim brought under § 36(b) of the Investment Company Act, 15 U.S.C. § 80a–35(b). The court held that defendants were precluded from litigating the existence of an implied cause of action for damages under the Investment Company Act by the principle of the law of the case, because the court, in an earlier appeal in the same case,

---

**8.** However, if plaintiffs do succeed in showing that a majority of the Tonopah directors who voted for the sale were aware of a plan to transfer the mine to La Luz, then they have no Rule 10b–5 claim, as deception is an essential element of such a claim, *Sante Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Maldonado v. Flynn,* 597 F.2d 789, 793 (2d Cir.1979).

had affirmed the existence of such a cause of action. *Id.* at 108. The court considered the *Transamerica* decision, as well as the "numerous" cases permitting private rights of action under the Investment Company Act, in determining whether a departure from the law of the case was warranted. *See id.* 108–12. The court concluded that although "the question of the existence of a private cause of action under the [Investment Company Act] has become more debatable than we or the defendants thought in 1975" it was "far from having 'a clear conviction of error'" that would justify departing from the law of the case. *Id.* at 112 (citation omitted).

In light of the *Fogel* decision and the court of appeals' earlier ruling in this case, the Court cannot give much weight to defendants' arguments. Clearly, plaintiffs' claim under the Investment Company Act is "more debatable" than it was back in 1972. Nevertheless, were this case to go to trial, plaintiffs would be permitted to assert it, absent a clear statement to the contrary by the court of appeals or the Supreme Court.

*Likelihood of success on the merits*

Plaintiffs' basic contention in this lawsuit is that the purchase price for the sale of the Rosita mine was unfair, and the disclosures made to the SEC materially misleading, because (1) defendants, at the time of the sale, knew of the existence of an economically feasible means of refining the Rosita ore; and (2) La Luz was in a uniquely advantageous position to operate the mine. Accordingly, they seek to recover the approximately $20 million earned by the mine.

The Court will consider first the claim that defendants made misrepresentations to the SEC regarding the commercial feasibility of refining the Rosita ore. Tonopah's application to the SEC for an exemption for the sale of 60% of its Tonopah Nicaragua stock was amended to include a report by Singmaster & Breyer, an engineering firm. That report—which updated an earlier report done by A. Wheeler in 1943—showed that the most economical means of refining the copper was through the use of a smelter, and that a capital investment of approximately $12 million would be required. *See* Amendment to Application to the SEC dated February 28, 1951. The application to the SEC for an exemption for the 40% sale to Mines was also amended to include a report by Singmaster & Breyer, based on tests of the Rosita ore performed by that firm in 1952 and 1953. That report concluded that use of a copper smelter was still the most feasible process for the Rosita ore.

The report also discussed laboratory tests employing a fluo solids process to refine the Rosita ore. It stated that the results of those tests were sufficiently encouraging to warrant the further testing that would be necessary to evaluate a project based on such a process, but that there was no commercial process in existence which could provide a reliable estimate of the capital costs and potential profitability of using a fluo solids process at Rosita. Amendment to Application to the SEC dated July 7, 1953. Similarly, in a letter to the SEC on behalf of Mines, Paul Zeckhausen stated that "[a]lthough the results of the laboratory-scale tests are encouraging they are far from conclusive." Letter from Paul Zeckhausen to SEC (Sept. 22, 1953). And in another letter to the SEC on behalf of Mines, L.H. Bregy wrote that "[r]esults of this laboratory scale work are so far encouraging and indicate the advisability of carrying out larger scale tests along the same lines." However, he stated that because further tests would be necessary, and a pilot plant would have to be designed and constructed, "[i]t can be definitely stated that a commercial process has not been developed at the present time, and that it will take a minimum of two or three years to do so, if it can be done at all." Letter from L.H. Bregy to the SEC (October 8, 1953).

Plaintiffs contend that at the time of the sale to Mines, defendants knew that the Leach-Precipitation-Flotation ("LPF") Process, the process that was ultimately used to refine the Rosita ore, was commercially feasible. Plaintiffs' case on this point

rests almost entirely on a number of articles, some dating as far back as the 1930s, which discuss use of the LPF Process. According to plaintiffs, these articles show that use of the LPF Process was widely known, and that defendants therefore knew that the Rosita ore could be economically refined.

However, establishing that the LPF Process existed in some form prior to 1951 does not prove that defendants—or anyone—knew at the time of the sales that it was an economically feasible means of refining the Rosita ore. In 1949, Tonopah, through a mining engineer named Frank Cameron, tried unsuccessfully to sell the Rosita property for $330,000. Cameron offered the property to 33 potential buyers, including a number of major mining concerns. In January 1950, Tonopah offered to a company called Compania Minera La India a 12-month option to buy the mine for $275,000. The fact that all 33 companies rejected Cameron's offer, and Compania Minera La India refused the option, suggests that however well known the LPF Process may have been, it was not then regarded in the industry as a commercially viable means of processing the Rosita ore.

Letters and memoranda that have been submitted on this motion indicate that defendants knew that the possibility of using a hydrometallurgical process to refine the Rosita ore was worth exploring. However, there is a substantial difference between establishing that defendants knew that the LPF Process was worth exploring and proving that they made material misrepresentations to the SEC. As already noted, the SEC application indicated that preliminary laboratory tests of an alternate means of refining the ore were encouraging, but that further tests were necessary to determine the economic feasibility of the process. Based on the documents that the Court has reviewed on this motion, the Court considers it unlikely that plaintiffs could prove that at the time of the SEC applications, defendants knew that the LPF Process was an economically feasible means of refining the Rosita ore or that defendants could have determined the necessary capital expenditures or potential profitability of the mine if it employed such a process, with any degree of certainty.

On the contrary, the documents submitted, including the letters and memoranda referred to above, the La Luz annual reports, and the depositions, in particular that of McGowan, the mine's manager, all seem to support defendants' contention that from 1951 through 1955, Rosita's management worked to develop a commercially feasible method of extracting the ore. Apparently, early on they considered a number of different techniques—including smelting and an electrolyte process—before determining that the LPF Process was the most promising, and they subsequently worked for a considerable period of time to adapt the process to the particular requirements of the Rosita ore. Apparently, the process as it was ultimately developed was unlike any that had previously been done. A July 1957 report by the Behre Dolbear & Company, Inc., a metallurgical consulting firm that reported on the Rosita property to the International Finance Corporation, stated:

> The Rosita Mine is planning to use treatment methods which are a combination of those of the Miami Copper Company, Inspiration Copper Company, and the Cyprus Mines Corporation. From the available information a combination of these processes appears feasible for Rosita ore and should make a reasonable recovery of the copper . . . .
>
> This process has worked on a laboratory scale, but unfortunately has not been carried out on a pilot plant basis.

Letter from Behre Dolbear & Company, Inc. by Parke A. Hodges to W.A. Jenkins of the International Finance Corp. (July 9, 1957), at 7–8.

The initial results of the mine's operations were unsatisfactory, and modifications to the process were required before the copper yield was acceptable. See La Luz annual reports for the years ending September 30, 1959–61.

In sum, there is little to support plaintiffs' claim that there were material mis-

representations to the SEC concerning the refining process for the Rosita ore. Based on its review of the documents, the Court concludes that plaintiffs' chances of success on this claim are sufficiently remote that, were this their only claim, the Court would be inclined to approve the settlement.[9]

██ However, plaintiffs also claim that defendants' failure to disclose La Luz's role in the transaction to the SEC was materially misleading, in violation of the Investment Company Act. They claim that although the sale was to Mines, defendants always intended La Luz to be the eventual owner of the mine. As explained earlier, La Luz was in a particularly advantageous position to develop the mine. It was already established in the area, and had made local and regional contacts; it was already operating a mine; and most significant, it had a source of hydroelectric power important to mining operations—particularly for the alternative refining processes that defendants appear to have been exploring—not far from the Rosita mine. Plaintiffs argue that the SEC would not have approved the proposed sale if La Luz—which had advantages that no other company had—and not Mines, were the prospective buyer. According to the plaintiffs, that was why the sale was structured and presented to the SEC in the way that it was.

In view of Tonopah's past unsuccessful attempts to sell the mine, it seems unlikely that the SEC would have prohibited any sale to La Luz. However, as the court of appeals observed, "the SEC, in all likelihood, would have insisted on a considerably higher price as a condition to permitting the sale." 456 F.2d at 903.

The success of plaintiffs' claim regarding La Luz's participation rests on their ability to prove that there was, prior to the sale to Mines, a plan to transfer ownership of the mine to La Luz, and that some or all of the

individuals responsible for the SEC applications participated in, or were aware of, such a plan.

In support of their claim, plaintiffs cite a number of documents, including La Luz's Annual Report for the year ended September 30, 1951, which states that a deferred expense item on the balance sheet in the amount of $26,763.62, entitled "Rosita property,"

> represents expenditures made by La Luz investigating a high-grade copper property within thirty miles of your gold mine in Nicaragua. Your Board considers this property as having great promise and has joined with Mines, Inc. and Northfield to purchase a 60% interest in the Tonopah Nicaragua company, who are the owners.

Defendants explain that the money represented an advance to Mines, that was subsequently repaid, and characterize La Luz's view of its ownership interest in the Rosita property as merely "misunderstanding or wishful thinking." Defendants' Memorandum at 63. However, the statements in La Luz's annual reports cannot be so lightly dismissed in view of the following statements from the annual reports of Ventures, its parent company and, through Frobisher, owner of 54% of Mines.

Ventures' Annual Report for the year ended December 31, 1951, at p. 8, states:

> La Luz holds, with other Ventures associates, 60% interest in the Rosita Copper mine, 30 miles northeast of Siuna, which contains deposits of copper-gold ore. The property has been developed by underground work and drilling which has outlined 3,500,000 tons of ore of average grade 2.9% copper and 0.028 ozs/ton gold, including over a million tons running better than 4.8% copper.

Ventures' Annual Report for the year ended December 31, 1952, at p. 9, states that "La Luz together with other Ventures asso-

---

**9.** As discussed above, the Court considers plaintiffs' chance of success on the merits of this claim—and, therefore, their chance of recovering any substantial portion of the mine's profits—to be slim. However, this is simply an evaluation of the likelihood of plaintiffs' suc-

cess on this claim—not a determination of its merits. On this motion, the Court cannot, and does not, foreclose plaintiffs from presenting whatever evidence they have in support of this claim at trial, or from recovering on that claim, should that evidence be sufficiently persuasive.

ciates, is interested in the possibilities of the Rosita Copper Mine, a copper-gold deposit 30 miles to the northeast of their gold property." The report goes on to discuss the copper reserves in the mine. And Ventures' Annual Report for the year ended December 31, 1953, at p. 12, states that:

> The Company's portfolio includes substantial interests in base metal enterprises of associated companies. La Luz, together with other Ventures associates, maintains its interest in the nearby Rosita Copper Mine in which substantial tonnages of ore are indicated.

Furthermore, according to an extract from the minutes of a meeting of La Luz's board of directors, held on June 3, 1952, La Luz had advanced to Mines $110,000 so that Mines could make its final payment to Tonopah for the 60% of the Tonopah Nicaragua stock. Apparently, the Canadian Foreign Exchange Control Board opposed La Luz's participation in property other than its gold mine. In exchange, La Luz received securities worth the amount of its advance. The minutes of La Luz's board of directors meeting state:

> It was understood that La Luz Mines Limited would have an option to return the shares . . . and take, in return, an equivalent in value of the shares of the Tonopah Nicaragua Company, and if it worked out to the satisfaction of all parties concerned La Luz would eventually reimburse Mines Inc. (and their associate, Northfield) for all expenditures pertaining to the deal and take over the entire Tonopah Nicaragua outstanding shares now held by Mines Inc. (750,000 shares). This matter was deemed as an expedient to expedite the completion of the deal for the Rosita property and subject to the proper working out of the mechanics at a later date.
>
> The Board was asked to give its approval to the above arrangement and to authorize further procedure along those lines. In order to properly present the matter for discussion the motion was made by Mr. John M. Easson, seconded by Mr. J.C. Rix, giving the above approval and authorization.

Minutes of meeting of La Luz's board of directors, held on June 3, 1952. After a discussion in which both McWilliams and Nonamaker, on behalf of Tonopah, expressed opposition to the motion, the La Luz board decided to hold the matter in abeyance and McWilliams was requested to outline in writing, "his ideas of what representation should be made . . . to the S.E.C." Id.

The board went on to discuss the possible dissolution of Tonopah Nicaragua and the formation of a new company to take over the Rosita operation, and other matters concerning the mine's management.

Defendants claim, based on the minutes discussed above, that Tonopah's representations to the SEC were accurate because at the June 3, 1952 meeting "Nonamaker and McWilliams successfully opposed the concept of La Luz involvement" in the Rosita operation. Reply Memorandum of the Appearing Defendants in Support of Approval of the Remand Settlement, at 20. However, their characterization of that meeting is clearly subject to challenge. One could argue that La Luz, at that point, was already involved. The minutes hardly compel the conclusion that there was no misrepresentation to the SEC in the application filed six months later.

The documents cited above are not the whole of plaintiffs' case. They cite additional documents and argue, moreover, that the absence of any discussion of the Rosita mine in Frobisher's annual reports, and the speed with which the mine was transferred through Frobisher to La Luz after the SEC granted the second exemption for the sale to Mines, all support their claim that defendants intended all along to transfer the mine to La Luz.

Based on everything that has been submitted to the Court, the Court concludes that plaintiffs have demonstrated a reasonable probability of success on this claim. Accordingly, the Court must consider the question of damages, for the Court will not withhold its approval of the proposed settlement unless it is warranted by plaintiffs'

potential recovery. According to calculations submitted by plaintiffs, derived from information in La Luz's annual reports, La Luz would have spent approximately $800,000 more for power had it been obliged to operate the mine entirely on diesel, rather than hydroelectric power. Defendants counter this with two arguments. First, they claim that La Luz's advantage was not unique to it, and that any other buyer of the mine could have negotiated with La Luz to obtain hydroelectric power. That may be true, but simple economics suggests that La Luz, with the only source of hydroelectric power in the area, could have charged a customer almost as much as it would have paid for the next available alternative, diesel power. Second, defendants claim that the appropriate measure of damages would be the difference between the price actually paid for the Tonopah Nicaragua stock, and the price that the SEC would have required, had it been aware of La Luz's involvement—in other words, the premium that the SEC would have attributed to La Luz's advantage in operating the mine. They argue that the SEC would have required a "fair" price; that a fair price is one fair to buyer as well as to seller; and that the SEC would not have insisted on a price that reflected all of La Luz's operating advantage, in light of Tonopah's previous unsuccessful attempts to sell the mine.[10]

The Court agrees with defendants that if plaintiffs succeed in proving that the SEC applications were materially misleading with respect to La Luz's involvement in the transaction, then the increase in purchase price or premium that the SEC would have attributed to La Luz's operating advantage is a logical measure of damages. Unfortunately, there is no way of determining what the SEC might have done, had it had all of the relevant information. Accordingly, the actual advantage that La Luz did derive from its ownership of the hydroelectric power source may well be the most appropriate measure of damages.

The Court is persuaded that plaintiffs' chances of recovery are sufficient to warrant disapproving the settlement. The Court cautions, however, that it has not subjected the documents to the detailed scrutiny necessary for a determination on the merits of plaintiffs' claims. It must be emphasized that the Court's opinion on the settlement is based only on an evaluation of the likelihood that plaintiffs will succeed at trial in establishing liability on defendants' part. It is not a determination of the merits of their claims, and nothing stated in this opinion constitutes either findings of fact or conclusions of law regarding those claims.

Clearly there are substantial risks in proceeding with a trial so long after the events complained of.[11] Nor is this opinion intended to indicate that plaintiffs, if they do succeed in establishing liability, will necessarily recover as much as $800,000. Defendants will certainly have an opportunity at trial to challenge plaintiffs' figures as to La Luz's hydroelectric power advantage, and to suggest a more appropriate measure of damages.

The Court has considered the fact that a trial of plaintiffs' claims is likely to be quite long and complex. Nevertheless, the other factors that must also be considered in deciding whether to approve a settlement—particularly, the circumstances surrounding the settlement negotiations, and the reaction of the members of the class—weigh against approval in this instance. This settlement has had problems since its inception. The circumstances under which it was

---

10. Of course, the difference in power expense does not fully account for La Luz's advantage in operating the mine, but the advantages that accrued to it because of its established presence in the country would be difficult, if not impossible, to quantify.

11. Clearly, plaintiffs face severe problems of proof at trial. As defendants' attorney pointed out at the hearing, the events in question occurred more than 30 years ago. All seven directors who voted on the transactions are dead, and we now have an estate suing an estate. Transcript of Hearing before this Court on July 15, 1983, at 70. However, as the court of appeals has observed, these problems may weigh heavily on defendants as well. 456 F.2d at 904 n. 11.

58

negotiated are clearly troublesome. *See* 456 F.2d at 898–901. The reaction of the class is somewhat problematic as well. It is not entirely accurate to say, as plaintiffs do, that only the defendants support the settlement. Until his death, Mr. Markowitz, *on behalf of the class,* supported it as well. And while it is true that few if any class members, other than those who have actively participated in this suit, have objected to this settlement, the lack of broader opposition must be considered in light of the faults in the notice that was sent to the shareholders. *See* 456 F.2d at 898, 900 n. 6. Significantly, Saylor, who brought this action, strongly objected to the settlement, as do his executors. That opposition cannot be attributed to a conflict between Saylor's interests and those of the other Tonopah shareholders, nor, in light of the foregoing, can it be dismissed as mere spite or wishful thinking. While none of these considerations is fatal to the settlement—if they had been, the court of appeals would not have suggested that its remand could result in renewed approval of the settlement—they must, nevertheless, be given some weight.

The Court has, therefore, considered all of the circumstances of this settlement. More important, it has considered the likelihood that plaintiffs could recover, on at least one of their claims, an amount substantially in excess of the settlement amount. On balance, the Court is persuaded that plaintiffs should have the opportunity to try the merits of their case, and that disapproving the settlement is in the best interests of the Tonopah shareholders.

Accordingly, the motion for approval of the settlement is denied. Upon the determination of the motion to amend the complaint, *see supra* note 6, the Court will fix a date for the submission of a pretrial order and a date for the trial of the issues.

So ordered.